LAMBRECHT *v.* POUDRE VALLEY NATIONAL BANK, ET AL.

## No. 11,856.

DECKER *v.* POUDRE VALLEY NATIONAL BANK, ET AL.

## No. 11,857.

EDWARDS *v.* POUDRE VALLEY NATIONAL BANK, ET AL.

Decided January 16, 1928.   Opinion adhered to April 2, 1928.

Action to establish a trust agreement and for specific performance.   Judgment for defendants.

### *Affirmed.*

1. CONTRACT—*Trusts—Agreement to Devise Property—Specific Performance—Proof.* Courts will not enforce specific performance of agreements to devise property except upon the strictest and most satisfactory proof thereof.

2. APPEAL AND ERROR—*Fact Findings.* Fact findings of the trial court will not be disturbed on review.

*Error to the District Court of Larimer County, Hon. Claude C. Coffin, Judge.*

Mr. THOMAS J. WARREN, Mr. PAUL J. McGOVERN, for plaintiffs in error.

Mr. L. R. TEMPLE, Mr. MORTIMER STONE, Messrs. STOW & STOVER, Messrs. MARTIN, NEWCOMER & FITZGERALD, Mr. EDWARD N. DONNELLAN, for defendants in error.

*Department One.*

MR. JUSTICE SHEAFOR delivered the opinion of the court.

THE plaintiffs in error, Arthur Lambrecht, Ella S. Decker and Irma L. Lambrecht, brought the three several suits in the district court, in this court numbered respectively 11,855, 11,856 and 11,857, against the defendants in error, The Poudre Valley National Bank of Fort Collins, Colorado, a corporation, as executor of the estate of William H. Lambrecht, deceased, Pansy M. Lambrecht, otherwise known as Mary Evangeline Lambrecht, William A. Lambrecht, a minor, and Lee W. Lambrecht, a minor, to establish a trust agreement, and to specifically perform the same, alleged to have been entered into between the parents of the several plaintiffs for the benefit of the latter. In No. 11,857, Sam L. Meyer and Oney H. Craw were joined as defendants because of their interest in parcel No. 4. In this opinion the plaintiffs in error will be referred to as the plaintiffs, and the defendants in error as the defendants. The three several cases were consolidated and tried together in the court below, and all will be disposed of here by this opinion. Findings and judgment were for defendants, and plaintiffs prosecute this writ of error. The defendants deny the making of the trust agreement and plead the statute of frauds; no part performance of the contract if there was one; the five-year statute of limitations, and laches.

It appears that Fannie Lambrecht, the mother of plaintiffs, died intestate in Boise, Idaho, February 22, 1919, and that William H. Lambrecht, the father of plaintiffs, died testate in Fort Collins, Colorado, May 1, 1925. The plaintiffs, with one Lilla B. Witmer, are the sole surviving children of Fannie and William H. Lambrecht. The will left by William H. Lambrecht was executed November 28, 1924, and probated June 15, 1925. The Poudre Valley National Bank of Fort Collins was named as executor. The will disinherited all of the testator's children, and disposed of his property to William A. Lambrecht, a

minor, and Lee W. Lambrecht, a minor, children of Pansy M. and Arthur Lambrecht, except so much of the estate as should be necessary to discharge all indebtedness against testator's residence property, so that same should be transferred to Pansy, divorced wife of Arthur Lambrecht, free and clear of encumbrances.

Fannie Lambrecht owned certain land designated herein as parcel No. 1, and appurtenant water rights. This parcel No. 1 consisted of a farm of eighty acres, located in Larimer county, Colorado. William H. Lambrecht owned certain lands designated as parcels Nos. 2, 3 and 4, with appurtenant water rights, and some other property. Parcel No. 2 consisted of about 135 acres of farming land; and parcel No. 3, a farm of about eighty acres, both farms situate in Larimer county, Colorado; parcel No. 4 consisted of a six-acre tract in the City of Fort Collins, Colorado.

While the title to the eighty acres, known as parcel No. 1, does not appear to be in dispute here, it must necessarily be referred to in the course of this opinion because of its connection with the subject matter of the alleged trust agreement.

The claim for relief of the several plaintiffs is founded upon an agreement alleged to have been entered into between Fannie Lambrecht and William H. Lambrecht, in substance as follows: That Fannie Lambrecht, then the owner of parcel No. 1, would stand seized in fee and possessed thereof, with the appurtenant water rights, to the use of William H. Lambrecht, for his life, remainder over to Irma L. Lambrecht, but reserved an estate for the life of Fannie; and in consideration thereof, among other things, William H. Lambrecht would stand seized in fee and possessed of parcels Nos. 2, 3 and 4, with appurtenant water rights to each of said parcels to the use of Fannie Lambrecht for her life, remainder over of parcel No. 2 to Arthur Lambrecht, remainder over of parcel No. 3 to Ella S. Decker, remainder over of parcel No. 4 to Irma L. Lambrecht; but reserved an estate for

the life of William H. Lambrecht in each of said parcels.

The trial court found that Fannie and William H. Lambrecht never entered into the alleged agreement, dismissed the several actions of the plaintiffs and did not pass upon the other issues presented.

Unless the evidence required the trial court to find that the alleged trust agreement had been entered into, and we think it did not, the judgment must be affirmed.

For many years prior to 1908, the Lambrechts lived in Larimer county, Colorado, where they acquired the property involved here. In that year they removed to Idaho, where they acquired other real estate, and where they resided until after the death of Fannie, in 1919. After her death, William H. Lambrecht returned to Fort Collins, where he continued to reside until his death in 1925. In 1913, Fannie Lambrecht executed a deed conveying parcel No. 1 to Irma L., with a request that upon the death of Fannie the deed should be delivered to Irma and recorded. This deed was delivered to Irma after the grantor's death by William H. Lambrecht, and placed of record. This deed from Fannie to Irma contained no reservation of a life use to William H., as provided in the alleged agreement, and in 1920, Irma listed it for sale.

The plaintiffs sought to establish the alleged trust agreement principally by proof of statements alleged to have been made by Fannie and William H. Lambrecht to or in the presence of the plaintiffs, or some of them, and Lilla B. Witmer, in conversations had at different times between 1908 and February 22, 1919, the last conversation occurring about one week before the death of Fannie.

Mrs. Witmer testified to a number of conversations between the parents concerning the disposition of their property and as to how they desired to distribute it among the children. The witness was to have the Idaho property and received it. She said that she was also to have any money left by William H. Lambrecht at his death. Concerning the agreement, she testified: "They

would say, 'this is about the most even way that we can divide.' They were referring to giving Irma the eighty, Arthur the hundred thirty-four acres, and Ella the eighty acres, and the Idaho farm property and the city property and the money to myself. The Elizabeth street property was to go to Irma. There was no other property belonging to mother and father at that time that I know of. This conversation took place in 1919. The disposition of the property was talked of considerably before then. I can remember the fall of 1917 in particular. Irma's eighty was to be divided between Irma and me, and Arthur was to have the one hundred thirty-four and Ella the eighty. It had been discussed generally in Colorado from the time I was thirteen years old, probably even younger.''

As to the conversation between the parents in the fall of 1917, at which Irma was present, the witness said: ''It was concerning Irma. She was to have that eighty acres, and we wanted that deed to be recorded just as soon as Mama—well, I don't know how I can say it word for word, but she asked Irma to have that deed recorded as soon as she was gone; that papa would take care of the rest of it, he was there, by disposing of the rest of the property among us, and he was there and agreed with it. I can't just repeat it word for word.''

The witness said that many such conversations had taken place during 1917 and 1918 while her parents lived with her, the last conversation occurring about six days before her mother's death. The witness then was asked: ''Q. Did you hear anything about who signed any deeds, your father, your mother, or either of them? A. Well, they said they had made the deeds out, so I suppose they were signed. Q. Well, now, did he say, or did she say it? A. She said it. He was there and agreed with her—they both talked.''

That appears to refer to a conversation had in the fall of 1917. Further testifying, the witness said, referring to the last conversation in 1919: ''About the

record of the deed? Yes, she told that to papa and one thing led to another, and Arthur's place came up, and he said, 'I gave that place to Arthur because he worked so hard from the time ever since he was nine years old, and done a man's work steady until he was twenty-four and never got any pay for it,' that papa would provide for the rest of us children by giving the rest of his property to them, and he said he didn't want his children to have to work like he and mama did to get a start. * * * Both of them said so. * * * Mama said she wanted papa to have the use of that eighty acres that belonged to Irma as long as he lived, if he wanted it, and the other places were to go to the other children at the time of her death. * * * Papa said they would get the other places upon his death. * * * Well, he said, papa said: 'I will get the Boise property and the money that was left would be left to me.' * * * Papa said he would give her (Ella) that eighty acres, he said there ought to be a house built on it; perhaps he could build one some day.''

The witness said that she could not give the exact dates of any conversations, ''only that we were in there almost every Sunday'' up to the time her mother died, and the conversations were almost exactly the same.

The witness then testified: ''On February 16, 1919, Mama said, she always said, she would go first, she wasn't well and strong, and if anything happened and she didn't and papa went first, 'We will do just as we agreed to do. We will give the property just as they had agreed, decided upon doing.' And, they always decided that if one went first and when they got the deeds for the property, that they should have the use of it as long as they lived; the other, you know, that survived, would have the use of it as long as they needed it. This statement was made by my mother in the presence and hearing of my father. He said the same thing. He agreed with her on it. I don't know as I can remember any particular words that he said, but he never, either

one, never disagreed. Q. I wish, Mrs. Witmer, if you can, you would state your father's exact words here that you referred to when you said that he agreed. A. He didn't say he agreed to it, he says, 'We decided that that was the most even way to divide the property.' Mama said it, too.''

Arthur Lambrecht testified that they were called together at Mr. Ault's office at the time of his mother's death, and called there by their father. He testified that he saw Exhibit G, which was the deed from his mother to Irma of the homestead eighty (parcel No. 1), and that there were four deeds there all together. There were two to himself; that one of them conveyed direct to him parcel No. 2, the 134 acres, and the other gave him a life estate with the remainder over to his two boys; that he had objected to the deed which gave him a life interest, and then the other deed was made which conveyed the property to him direct.

The only deed that appears to have been delivered was the one from the mother to Irma, of parcel No. 1. Irma testified that at the time the deed was delivered to her, her father said that she then had her share of the estate. Asked about other deeds, she said: ''Yes; papa said that the other deeds were in the box, Arthur's and Ella's and mine to the Elizabeth street place, but I don't remember exactly the words that he said. I don't remember there was anything said as to the deeds to the Idaho property. Papa further said, referring to my place, 'remember I got to have the income from that place as long as I live if I want it.' I don't remember that he said anything about parcel number two, or Arthur's place, except that he said as soon as he died those other deeds were to be recorded. I don't recall that he said anything about parcel number three, or the school house eighty, except that the deed was to be recorded as soon as he died.''

Referring to a conversation which occurred in 1917, at Mrs. Witmer's, when the witness was present, she said;

"As nearly as I can remember the words of the conversation, mama, who was in poor health then, said she didn't know if she would ever see me again or not, and before I left she wanted to go over with me the disposition that they had made of their property, how they were going to divide it, how we were to get it after they died. Papa was there and heard the conversation. She said her eighty acres was to go to me as my share, together with that Elizabeth street property, and she said that just as soon as she died she wanted me to have that deed recorded, and she says there is two dollars in the bag hanging in the closet with which to do it. They both talked and they went on and said that Arthur's deed was made out on the 135 acres, and Ella's and mine was in a deed, and that Lilla had gotten some share of her estate, and that she was to get the Idaho property and the money that was left. * * * I knew that mine would be in the lock box in case mama died.

Mama said and papa said that they had divided the property as even as they knew how, and they thought it was the best they could do by us children. Mama said, 'We have decided on this way of dividing the property and I think that is as even a way, as fair a way, as we can divide it.' Father was present when that declaration was made. He didn't dissent. He said, 'Yes, that is right that they had done the best they knew how.'

I was not present at any subsequent conversation. In that conversation it was said that the deed was to be recorded, but papa was to have the use of the place as long as he wanted it. Mama made that statement and so did papa."

Mrs. Decker testified: "At those conversations they said they wanted to divide the property equally among we children, and designated the parcels we were to have. * * *, but in Idaho, when I went there, I especially remember them because mama wasn't well. I was in Idaho several times when they lived there. * * * I paid cash rent on the home place (parcel No. 1) from 1914 to 1920,

all but one year, in 1920 and 1921, we paid crop rent. We paid the cash rent to papa and I paid one year's crop to papa, that was in 1919. I paid the 1920 rent to Irma. * * * In the year 1920, in the agreement that mama had decided on, papa was to get the income from Irma's eighty after her death, * * *. I can fix the date of a conversation had with my parents regarding the division of their property as when I was there in '17. They were talking about Arthur's land, papa and mama. They said the first deed had been made to the boys, to Arthur for life, and they said that Arthur was mad about it, and they had decided to make another deed for him. Papa said he had made a deed to Arthur for life and the boys at his death, and that Arthur was mad about it and he decided to change it. My mother said at that time, she just spoke of the deed, and she said she was going to change it and I was going to get the eighty and Irma eighty, the home eighty. She said Irma would get the home eighty. They argued a long time about Arthur's. They said they supposed he would be satisfied. They were in perfect accord as to what should be done, but they were talking about cutting Pansy out of it, said she would try to get it. * * * There was something said about the use of those lands, papa was to have the use of them during his lifetime, and at his death the deeds were to go to we children. The same thing was decided on Irma's eighty, * * * Lilla was mentioned in those conversations. She was to get the Idaho property and the residence and to get what was left. * * * I don't remember the date in 1917, it was either October or November. The conversation was about the same as the other, only mama said she didn't think she would have much longer to live, she wanted to be sure everything was right. She said she wanted we children to be provided for, to have their land, that they had made out deeds to that effect. * * * I recall the making of deeds by my father during this time; don't remember just when they were made, but they were made in Winton Ault's office.''

She testified to having seen deeds from William H. Lambrecht, grantor, to respective plaintiffs, grantees of the respective parcels Nos. 1, 2, 3 and 4; that the deed to Arthur Lambrecht was "unlimited," and that she saw those deeds in Ault's office several times.

She further testified: "There was Arthur's deed to the hundred and thirty-four and my deed to the eighty, and Irma's, I would take it, to the Elizabeth street property because I think mama had made her deed out long ago to Irma."

Mr. Ault testified for the plaintiffs and said that he had made out a number of deeds for Mr. Lambrecht until in 1914 or 1915, when he made the final deeds, one to the homestead eighty (parcel No. 1), from Fannie to Irma, one for the eighty acres (parcel No. 3) to Ella Decker from William H. Lambrecht, and one to Arthur Lambrecht from William H., for the 135 acre tract (parcel No. 2). He said those deeds were sent to Mr. Lambrecht and were acknowledged by him in Idaho and returned to the witness; that he prepared a deed to Mrs. Witmer from William H. for the Idaho property. He testified that he did not know when the deeds were taken out of the box and did not know whether he destroyed them or sent them to William H. Lambrecht. He said when William H. sold the 135 acre tract (parcel No. 2) to Stroh, and the eighty acres (parcel No. 3) to Pitsch, that upset things and the deeds that he had made could not take effect; that then he advised Lambrecht to make a will. Ault testified that there were no reservations to the parents in any of the deeds mentioned, and that they were to take effect on the death of the parents. Ault said he drew several wills for William H. Lambrecht, the first one in 1921.

The record of the evidence in these cases is very voluminous, and to quote further from it would serve no useful purpose. The foregoing is the principal evidence introduced for the purpose of establishing a trust agreement between the parents.

On January 6, 1920, William H. Lambrecht executed and delivered a warranty deed to Conrad Stroh, of parcel No. 2. Stroh made a cash payment of ten thousand dollars, and having failed to make the remaining payments, which were secured by a trust deed, the deed was foreclosed and the title revested in Lambrecht. Irma testified that after the sale to Stroh, she wrote to Arthur and informed him about it and that he was "sort of angry"; that she told him that her father had said the money would go to him.

On November 8, 1924, William H. Lambrecht made a deed to Pansy, the divorced wife of Arthur, of parcel No. 2, the same which had previously been sold to Stroh. In that deed there was reserved to the grantor full right and use and occupancy of the land and water stock, together with the rents for and during his natural life.

In September, 1920, William H. Lambrecht contracted to sell to Jacob Pitsch parcel No. 3, upon which he made a cash payment. The cash payment made by Pitsch was not paid to Ella but was sent to William H. in Idaho. Pitsch made default in the payment of the remaining installments, and in February, 1922, he made a quit-claim deed of the premises to William H.

About June 1, 1921, William H. entered into a written contract with Ella by which he agreed to convey to her parcel No. 3, in consideration of the sum of $22,000, with a cash payment of $1,000. The initial payment was made, but default made in the further payments. Ella then left the land and removed to Greeley.

On January 5, 1925, William H., by warranty deed, conveyed parcel No. 3 to William Lambrecht, Jr., and Lee Lambrecht, grandchildren of William, reserving in this deed a life estate to himself.

On January 30, 1925, William H. Lambrecht gave a mortgage on three acres of the Elizabeth street six acres, parcel No. 4, to secure payment of a loan of $2,500, and in February of that year he conveyed the same to Oney H. Craw. Plaintiff, in No. 11,857, does not seek to obtain

title to this parcel, but to obtain the purchase money installments paid and to be paid therefor by Craw.

After title to parcels Nos. 2 and 3 had revested in William H. Lambrecht, he listed both tracts with a real estate agent for sale. About the same time he and his daughter Ella listed parcel No. 2 for sale with another real estate agent, and she talked with the agent about the sale of the property a number of times. William H. also listed for sale parcel No. 2 with still another real estate agent.

The record discloses that in 1924, Mr. Ault prepared a will to be executed by William H., his daughter Irma being with him at the time at Mr. Ault's office. Irma said that there was considerable talk at that time between her and her father relative to the disposition of his property. By the will then prepared, Ella Decker and Mrs. Witmer were to have parcel No. 3 jointly; Irma was to have parcel No. 2 in her name, placed there at Arthur's request, and that Arthur was to get it from her. Irma was to have the Elizabeth street property, parcel No. 4.

In a letter written by William H. Lambrecht to Irma, under date of October 25, 1922, he said, referring to parcel No. 2: "I was going to take an option but thot will write to Arthur first. Wrote will not come he wrote me that place belongs to me, he didn't go to Idaho, told that place in Colorado belongs to me, I can do with it what I pleased. So you can see how I tried everything done no good."

The voluminous correspondence passing between the father and children adds very little, if anything, to the evidence already discussed, so far as it tends to establish the trust agreement.

If this evidence is sufficient to prove the existence of the trust agreement, it must necessarily contradict and render ineffective the deeds executed by William H., and his last will and testament as well.

To establish such agreement, the evidence must be clear and convincing. We have held that: "Though courts have the power to enforce specific performance of

oral or written contracts to devise lands and other property, they do not do so except upon the strictest and most satisfactory proof thereof. * * * To accomplish a cancellation of this will, much more explicit and unequivocal evidence is required than that produced by the plaintiff. * * * In *Fagan v. Fisher,* 74 Colo. 473, 222 Pac. 647, the court said that evidence of such contracts must be strong and unequivocal. To the same effect is *Allen v. Sacket,* 76 Colo. 431, 231 Pac. 1110. The material testimony in the instant case is largely that of persons who testified to oral statements or admissions of decedent against his interest. Oral testimony of oral statements against interest made by deceased persons is uniformly considered the weakest of all evidence." *Swedish Church v. Benson,* 77 Colo. 370, 237 Pac. 165.

"But it is equally well settled that where it is sought as against a deed, absolute in terms, to establish a trust by parol evidence alone, in order to take the case out of the statute of frauds, the contract must be established by clear, certain and conclusive proof, unequivocal in all its terms." *Whitsett v. Kershow,* 4 Colo. 419, 423.

In support of their contention, plaintiffs cite *Brown v. Johanson,* 69 Colo. 400, 194 Pac. 943, and insist that this case is decisive of the question under discussion here. We do not think so. In that case we held that the contract was composed of the two wills considered and construed together. Because of the dissimilarity of the facts in that and the instant case, the case cited cannot be considered as an authority.

It was within the province of the trial court to determine from all the facts and circumstances shown by the evidence, as well as from all inferences which might be drawn from the evidence, whether there was such a contract as claimed. That court having found against the existence of such contract, we cannot disturb the finding. *DeSollar v. Blauvelt,* 77 Colo. 436, 237 Pac. 153.

The judgment is affirmed.

MR. CHIEF JUSTICE DENISON, MR. JUSTICE WHITFORD and MR. JUSTICE ADAMS concur.